Filed 7/28/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE ex rel. KAMALA D. HARRIS, as Attorney General, etc., | ) ) ) | |
| Plaintiff and Appellant, | ) ) | |
| | ) | S194388 |
| v. | ) ) | |
| | ) | Ct.App. 2/5 B220966 |
| PAC ANCHOR TRANSPORTATION, INC., et al., | ) ) ) | Los Angeles County |
| | ) | Super. Ct. No. BC397600 |
| Defendants and Respondents. | ) | |

_____

The narrow question presented is whether an action under the unfair competition law (Bus. & Prof. Code, § 17200 et seq. (UCL)) that is based on a trucking company's alleged violation of state labor and insurance laws is "related to a price, route or service" (49 U.S.C. § 14501 (c)(1)) of the company and, therefore, preempted by the Federal Aviation Administration Authorization Act of 1994 (Pub.L. No. 103-305 (Aug. 23, 1994) 108 Stat. 1569) (FAAAA).  The FAAAA provides that a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  (49 U.S.C. § 14501 (c)(1).)  The People, on behalf of the State of California, filed this action against defendants Pac Anchor Transportation, Inc. (Pac Anchor) and Alfredo Barajas (Barajas) for misclassifying drivers as independent contractors and for other alleged violations of California's labor and unemployment insurance laws.

As we explain, we conclude that the FAAAA does not preempt the People's UCL action against defendants. We therefore affirm the Court of Appeal's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant Pac Anchor is a trucking company in Long Beach, California. Defendant Barajas is the company's owner, manager, and truck dispatcher. Barajas also separately owns approximately 75 trucks. He recruits drivers to drive his trucks for his independent company. He also enters into lease agreements with Pac Anchor in order to utilize the trucks and drivers he supplies. Both defendants classify these drivers as independent contractors, even though they invest no capital, own no trucks, and do not use their own tools or equipment. The drivers rely instead on defendants to supply those items. Drivers are often employed for extended time periods, but they can be discharged without cause, have no operational control, have no other customers, take all instruction from defendants, and have no Department of Transportation operating authority or permits to engage independently in cargo transport. In addition, the drivers are an integrated part of defendants' trucking business because they perform the core activity of delivering cargo.

On September 5, 2008, the People filed a complaint against defendants for violating the UCL. The complaint alleged that defendants misclassified drivers as independent contractors and therefore illegally lowered their costs of doing business by engaging in acts of unfair competition including, but not limited to, failing to take the following statutorily mandated actions: (1) pay unemployment insurance taxes (Unemp. Ins. Code, § 976); (2) pay employment training fund taxes (*id*., § 976.6); (3) withhold state disability insurance taxes (*id*., § 984); (4) withhold state income taxes (*id*., § 13020); (5) provide worker's compensation (Lab. Code, § 3700); (6) provide employees with itemized written wage statements (*id*., § 226) and provide employees with certain records that

2

California's Industrial Welfare Commission wage order No. 9-2001, section 7, requires (Cal. Code Regs., tit. 8, § 11090 (hereafter IWC Wage Order No. 9)); (7) reimburse employees for business expenses and losses (Lab. Code, § 2802); and (8) ensure payment at all times of California's minimum wage (Lab. Code, § 1194; IWC Wage Order No. 9, § 4). The People specifically noted that as a result of failing to follow the above statutes, defendants obtained an unfair advantage over their competitors, deprived employees of benefits and protections to which they are entitled under California law, harmed their truck driver employees, harmed the general public, and deprived the state of payments for California state payroll taxes, all in violation of the UCL. The People seek injunctive relief, civil penalties, and restitution.

In August 2009, defendants filed a motion for judgment on the pleadings. After a hearing in September 2009, the trial court concluded that the FAAAA preempted the People's action. It issued an order granting judgment on the pleadings in defendants' favor on three grounds. First, it cited *Fitz-Gerald v. SkyWest, Inc.* (2007) 155 Cal.App.4th 411, 423 (*Fitz-Gerald*). That case held that the similar provision of the earlier Airline Deregulation Act of 1978 (ADA) (49 U.S.C. § 41713(b)(1), now the FAAAA) preempted UCL causes of action against an airline for alleged wage and rest/meal break violations because they related to the airline's "price, route, or service." Second, the court found that requiring defendants to treat truck drivers as employees would increase their operational costs. Therefore, the action also related to their price, route, or service. Third, the court concluded that the action threatened to interfere with the forces of competition by discouraging independent contractors from competing in the trucking market. The People filed a timely notice of appeal. The Court of Appeal reversed the trial court judgment, holding that because the People's UCL action is not related to Pac Anchor's price, route, or service as a motor carrier, the FAAAA

3

does not preempt this action against defendants.  We granted defendants' petition for review.

DISCUSSION

### A.  *Standard of Review*

"A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action.  (Code Civ. Proc., § 438, subd. (c)(3)(B)(ii).)  A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review."  (*Kapsimallis v. Allstate Ins. Co*. (2002) 104 Cal.App.4th 667, 672.)  "All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law . . . ."  (*Ibid*.)  Courts may consider judicially noticeable matters in the motion as well.  (*Ibid.*)

### B.  *Federal Preemption Principles*

The supremacy clause of the United States Constitution establishes that federal law "shall be the supreme law of the land . . . , any thing in the Constitution or laws of any state to the contrary notwithstanding."  (U.S. Const., art. VI, cl. 2.)  Consequently, the supremacy clause vests Congress with the power to preempt state law.  "Congress may exercise that power by enacting an express preemption provision, or courts may infer preemption under one or more of three implied preemption doctrines:  conflict, obstacle, or field preemption."  (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059 (*Brown*); see *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc*. (2007) 41 Cal.4th 929, 935.)  Express preemption occurs when Congress defines the extent to which its enactments preempt state law.  (*Viva!,* at p. 936.)  Conflict preemption is found when it is impossible to comply with both state and federal law simultaneously.  (*Ibid.*)  Obstacle preemption occurs when state law stands as an obstacle to the full accomplishment and execution of congressional objectives.  (*Ibid.*)  Field

4

preemption applies when federal regulation is comprehensive and leaves no room for state regulation. (*Ibid.*) Here, all parties agree that our review is limited to the express preemption provision of the FAAAA. (*Rowe v. New Hampshire Motor Transp. Assn.* (2008) 552 U.S. 364, 368 (*Rowe*); see *American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219, 222-223 (*Wolens*) [construing similar express preemption clause of the ADA]; *Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 383-384 (*Morales*) [same].)

We recently observed that "[t]he United States Supreme Court has identified 'two cornerstones' of federal preemption analysis. [Citation.] First, the question of preemption ' "fundamentally is a question of congressional intent." ' [Citations.] If a statute 'contains an express pre-emption clause, our "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's pre-emptive intent." ' [Citations.] ' "Also relevant, however, is the 'structure and purpose of the statute as a whole,' [citation] as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." ' [Citation.]" (*Brown, supra,* 51 Cal.4th at pp. 1059-1060; see *Wyeth v. Levine* (2009) 555 U.S. 555, 565 (*Wyeth*); *Morales, supra*, 504 U.S. at p. 383; *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1265 (*Tobacco Cases II*).)

" 'Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " ' [Citations.]" (*Brown, supra*, 51 Cal.4th at p. 1060.) This is known as the presumption against preemption, and its role is to " ' "provide[] assurance that 'the federal-state balance' [citation] will not be disturbed

5

unintentionally by Congress or unnecessarily by the courts." ' [Citation.]" (*Ibid.*; see *Wyeth, supra,* 555 U.S. at p. 565; *Tobacco Cases II, supra*, 41 Cal.4th at p. 1265.) The high court, however, in response to a state's argument for a " 'public health' " exception to FAAAA preemption, has stated that the FAAAA creates no exemption for state "laws that it would otherwise pre-empt." (*Rowe, supra*, 552 U.S. at p. 374; accord, *DiFiore v. American Airlines, Inc*. (1st Cir. 2011) 646 F.3d 81, 86 [neither *Rowe*, nor *Morales*, nor *Wolens* "adopted [the] position . . . that we should presume strongly against preempting in areas historically occupied by state law"].)

With these principles in mind, we turn to the FAAAA's express preemption provision. In analyzing the provision, we rely on the analytical framework provided by the high court's jurisprudence on the subject.

C. *The FAAAA*

The United States Supreme Court recently explained the history and purpose of the FAAAA: "In 1978, Congress 'determin[ed] that "maximum reliance on competitive market forces" ' would favor lower airline fares and better airline service, and it enacted the [ADA]." (*Rowe*, *supra*, 552 U.S. at pp. 367-368.) "In order to 'ensure that the States would not undo federal deregulation with regulation of their own,' that Act 'included a pre-emption provision' that said 'no State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier.' "[1] (*Rowe,* at p. 368.)

---

[1] "Reenacting Title 49 of the U.S. Code in 1994, Congress revised this clause to read: [¶] '. . . related to a price, route, or service . . . .' Congress intended the revision to make no substantive change. Pub.L. 103-272, § 1(a), 108 Stat. 745." (*Wolens*, *supra*, 513 U.S. at p. 223, fn. 1.) The terms "rates" and "prices" will be used interchangeably.

"In 1980, Congress deregulated trucking." (*Rowe, supra*, 552 U.S. at p. 368, citing Motor Carrier Act of 1980 (Pub.L. No. 96-296 (July 1, 1980) 94 Stat. 793).) "[I]n 1994, Congress similarly sought to pre-empt state trucking regulation." (*Rowe,* at p. 368, citing FAAAA, 108 Stat. 1569, 1605-1606 & Interstate Commerce Com. Termination Act of 1995 (Pub.L. No. 104-88 (Dec. 29, 1995) 109 Stat. 803, 899).) "In doing so, it borrowed language from the [ADA] and wrote into its 1994 law language that says: '[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.' " (*Rowe,* at p. 368, quoting 49 U.S.C. § 14501(c)(1); see *ibid*., citing 49 U.S.C. § 41713(b)(4)(A) [similar provision for combined motor-air carriers)].)[2]  Specifically, the FAAAA was intended to prevent state regulatory practices including "entry controls, tariff filing and price regulation, and [regulation of] types of commodities carried." (H.R. Conf. Rep. No. 103-677, 2d Sess., p. 86 (1994), reprinted at 1994 U.S. Code Cong. & Admin. News, p. 1758.)

In *Morales*, the Supreme Court set out fundamental principles that define the scope of ADA preemption. (*Morales, supra*, 504 U.S at pp. 388-390.)

[2]    The full text of title 49 United States Code section 14501(c)(1) provides: "(1) General rule.—Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." Paragraph (2) discusses three exempt matters: (1) state regulation of motor vehicle safety, highway controls, and minimum amounts of insurance; (2) household goods; and (3) tow trucks. (*Id.*, § 14501(c)(2).) Paragraph (3) deals with "Continuation" of "State standard transportation practices," such as "uniform bills of lading or receipts" and "antitrust immunity for joint line rates . . . ." (*Id.*, § 14501(c)(3).)

*Morales* called for an analysis of the underlying state regulations on advertising to determine if they related to carrier prices. After finding that "every one" of the state guidelines on advertising at issue bore a " 'reference to airfares,' " the court held that the ADA preempted the claims of a coalition of state attorneys general who threatened to use consumer protection laws to enforce state advertising regulations against airlines. (*Morales*, at p. 388.) *Morales* did not address whether the advertising guidelines derived from the enactment or enforcement of state law. Instead, the court found that the state advertising regulations were preempted because they required that advertisements referencing airfares clearly state any applicable "variations in fares" as well as any "material restrictions on the fares' availability," and that airlines make advertised fares "available in sufficient quantities to 'meet reasonably foreseeable demand.' " (*Id*. at p. 387.) "[V]iolations of these requirements would give consumers a cause of action . . . for an airline's failure to provide a particular advertised fare — effectively creating an enforceable right to that fare . . . ." (*Id.* at p. 388.)

In addition, the state regulations had a "*forbidden significant effect on fares*" (*Morales*, *supra*, 504. U.S. at p. 388, italics added) because the restrictions on fare advertising increased consumer difficulty in determining the lowest cost. " '[W]here consumers have the benefit of price advertising, retail prices often are dramatically lower than they would be without advertising.' " (*Id*. at p. 388.) *Morales* did suggest that " '[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." (*Id*. at p. 390.) But the court expressed " 'no views about where it would be appropriate to draw the line' " because the case before it did "not present a borderline question." (*Ibid*.)

The Supreme Court's "second encounter with the ADA's preemption clause" arose in the context of a consumer fraud claim that sought to enjoin

8

American Airlines from devaluing the benefits associated with its frequent flyer program. (*Wolens*, *supra*, 513 U.S. at p. 223.) *Wolens* decided whether a claim brought under the Illinois consumer fraud act fell within the ADA's proscription that " '[N]o State . . . shall enact or enforce any law' " relating to price, route, or service. (*Wolens*, at pp. 222-223.) The court held that the consumer fraud act constituted state enforcement of a law relating to price, because it "serve[d] as a means to guide and police the marketing practices of airlines." (*Wolens*, at p. 228; see *Northwest, Inc. v. Ginsberg* (2014) 572 U.S. ___ [134 S.Ct. 1422] [ADA preempts state law claim for Northwest Airlines's breach of implied covenant of good faith and fair dealing regarding changes to its frequent flyer program].)

The Supreme Court incorporated the holdings of *Morales* and *Wolens* in the FAAAA context when it decided *Rowe*, *supra*, 552 U.S. 364. Because in *Morales* the high court had previously interpreted the same language as contained in the 1978 ADA, and Congress endorsed this interpretation, the *Rowe* court followed *Morales*'s interpretation of the ADA in order to interpret the FAAAA. (*Rowe, supra*, 552 U.S. at pp. 370-371.) Initially, *Rowe* observed that FAAAA preemption applies only to claims that (1) derive from the enactment or enforcement of state law, and (2) relate to a motor carrier's prices, routes, or services with respect to the transportation of property. (*Rowe, supra,* 552 U.S. at pp. 370-372.) *Rowe* held that the FAAAA preempted a provision of Maine's tobacco delivery law that required tobacco distributors to utilize a delivery service that would verify whether "the person to whom the package [was] addressed [was] of legal age to purchase tobacco." (*Rowe*, at p. 368.) The court conceded that an initial review of the regulation might make it appear applicable to shippers rather than carriers. However, the court observed that the effect of Maine's law would be substantial because "carriers will have to offer tobacco delivery services that

9

differ significantly from those that, in the absence of the regulation, the market might dictate." (*Id*. at p. 372.)

More recently, in *Dan's City Used Cars, Inc. v. Pelkey* (2013) 569 U.S. ___ [133 S.Ct. 1769] (*Dan's City*), the plaintiff brought suit under various state laws, including the New Hampshire Consumer Protection Act, to recover damages from a defendant who towed the plaintiff's car and traded it to a third party without compensating the plaintiff. (*Dan's City, supra*, 569 U.S. at p.___ [133 S.Ct. at p. 1775].) The court initially noted that where Congress has superseded state legislation by statute, its duty is to focus on the statutory language in order to " 'identify the domain expressly pre-empted.' " (*Id*. at p. __ [133 S.Ct. at p. 1778].) The court observed that "it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.' [Citation.] [¶] Title 49 defines 'transportation,' in relevant part, as 'services related to th[e] movement' of property, 'including arranging for . . . storage [and] handling . . . .' " (*Dan's City,* at p. __ [133 S.Ct. at pp. 1778-1779].) These fall within the FAAAA's ambit "only when those services 'relat[e] to th[e] movement" of property." (*Id.* at p. __ [133 S.Ct. at p. 1779].) Because the FAAAA preempts only state laws that relate to motor carrier " 'price, route, or service . . . with respect to the transportation of property,' " a unanimous court held that the plaintiff's state law claims, including his claim under New Hampshire's consumer protection act, were unrelated to the transportation or service of a motor carrier. (*Id.* at p. __ [133 S.Ct. at p. 1775], italics omitted.)

*Dan's City* determined that the New Hampshire law did not run afoul of the congressional purpose behind the FAAAA, namely, to prevent individual states from substituting their " 'own governmental commands for competitive market forces in determining . . . the services that motor carriers will provide.' " (*Dan's*

*City, supra,* 569 U.S. at p. __ [133 S.Ct. at p. 1780].) The law in question did not "constrain participation in interstate commerce by requiring a motor carrier to offer services not available in the market. Nor [did it] 'freez[e] into place services that carriers might prefer to discontinue in the future.' " (*Ibid.*)

*Morales, Wolen*s, *Rowe,* and *Dan's City* each establish when a claim is expressly preempted. (See, e.g., *Tanen v. Southwest Airlines Co*. (2010) 187 Cal.App.4th 1156, 1166-1167.) Based on these cases, in order to find FAAAA preemption here, defendants must show that the People's UCL claim (1) derives from the enactment or enforcement of state law, and (2) relates to Pac Anchor's prices, routes, or services with respect to the transportation of property. (*Rowe, supra,* 552 U.S. at pp. 370-372.) Because the People concede the UCL claim against Pac Anchor derives from the enforcement of state law, the issue narrows to whether the People's claim "relate[s] to" Pac Anchor's price, route, or service "with respect to the transportation" of property. (49 U.S.C. § 14501(c)(1).)

Defendants make two preemption arguments: First, they assert that the FAAAA facially preempts all claims against motor carriers brought under California's UCL; second, they argue that the People's particular UCL claim is preempted as applied to this case. We turn to the facial preemption argument first.

D. *Facial Preemption of California's UCL*

Defendants contend that UCL claims against motor carriers are facially preempted because they regulate the effect that unfair business practices have on the quality and price of goods and services. They rely on *Fitz-Gerald*, which held that the ADA preempted a UCL claim based on state minimum wage laws because *Morales* and *Wolens* "held that claims under a state unfair business practices statute are preempted." (*Fitz-Gerald, supra,* 155 Cal.App.4th at p. 423.) The Court of Appeal here rejected the argument, holding that when a cause of action is based on allegations of unlawful violations of the state's labor and employment

11

laws, there is no reason to find preemption simply because the pleading raises these issues under the UCL, as opposed to separate causes of action. The People add that the UCL's application here does not interfere with the FAAAA's regulations because that act preempts only state regulations that are specifically "related to" the "price, route, or service" *of motor carriers* for violations involving the "transportation of property." (See 49 U.S.C. § 14501(c)(1).) As we explain, the Court of Appeal and the People have the better interpretation.

The UCL's "scope is broad," and its coverage is " 'sweeping.' " (*Cel-Tech, supra,* 20 Cal.4th at p. 180; see *Zhang v. Superior Court* (2013) 57 Cal.4th 364 [analyzing a UCL claim against an insurance company].) It defines unfair competition to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, § 17200.) The UCL does not mention motor carriers, or any other industry for that matter; it is a law of general application. In *Tobacco Cases II*, we held that, as a general matter, the UCL is not subject to preemption on its face by the Federal Cigarette Labeling and Advertising Act (15 U.S.C. § 1331 et seq.), which governs cigarette sales to minors, because it "is a law of general application, and it is not based on concerns about smoking and health." (*Tobacco Cases II*, *supra*, 41 Cal.4th at p. 1272; see *Dan's City, supra,* 569 U.S. at pp. __ [133 S.Ct. at pp. 1778-1779] [FAAAA does not preempt state consumer protection law of general application].) Similarly, here the FAAAA embodies Congress's concerns about regulation of motor carriers with respect to the transportation of property; a UCL action that is based on an alleged general violation of labor and employment laws does not implicate those concerns.

Indeed, defendants have conceded, as they must, that the FAAAA does not preempt generally applicable employment laws that affect prices, routes, and services. (See, e.g., *Californians for Safe Dump Truck Transp. v. Mendonca* (9th

Cir. 1998) 152 F.3d 1184, 1190 (*Mendonca*) [holding that the FAAAA does not preempt California's prevailing wage law when enforced against transportation companies].) *Mendonca* emphasized that in drafting the FAAAA, Congress observed that 10 jurisdictions had not enacted laws to regulate intrastate prices, routes, or services, despite the fact that seven of those states had wage and hour provisions similar to California's. (*Mendonca*, at p. 1187.) *Mendonca* concluded that Congress's observation that those seven states did *not* regulate prices, routes, or services "constitute[d] indirect evidence that Congress did not intend to preempt" the regulations there at issue. (*Id.* at p. 1188.) We observe that all 10 of the jurisdictions identified in *Mendonca* had unfair competition laws or deceptive trade practices statutes in force at the time Congress passed the FAAAA and that Congress did not perceive these laws as implicating regulation of prices, routes, or services. (See Alaska Stat. § 45.50.471 [prohibiting "unfair methods of competition" and "unfair or deceptive acts or practices]; Ariz. Rev. Stat. § 44-1522 [prohibiting deceptive practices in employment]; see also Del. Code Ann. tit. 6, § 2513 [prohibiting deceptive practices in employment]; D.C. Code § 28-3904 [enacting a broad deceptive practices prohibition]; Fla. Stat. § 501.204 [broadly prohibiting deceptive and unconscionable trade practices]; Me. Rev. Stat. Ann. tit. 5, § 207 [prohibiting unfair or deceptive practices in competition]; Md. Code Ann., Com. § 13-303 [restricting unfair or deceptive trade practices]; N.J. Stat. Ann. § 56:8-2 [prohibiting fraud and deceptive trade practices]; Vt. Stat. Ann. tit. 9, § 2453 [prohibiting unfair trade practices in commerce]; Wis. Stat. § 100.20 [providing that business methods and competition in business must be fair].)

　　*Dan's City* impliedly approved *Mendonca*'s reasoning on this point. Like *Mendonca*, *Dan's City* expressly incorporated an earlier federal employee retirement income security act (ERISA) preemption case into its FAAAA analysis. (*Dan's City, supra,* 569 U.S. at p. __ [133 S.Ct. at p. 1778], citing *New York State*

13

*Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514

U.S. 645, 655-656 (*Travelers*); see *Mendonca, supra,* 152 F.3d at pp. 1188-1189.)

As *Mendonca* noted, *Travelers* rejected the notion that under ERISA's broad

preemption provision, Congress intended to preempt "basic regulation of

employment conditions" even though such regulation "will invariably affect the

cost and price of services." (*Travelers, supra,* 514 U.S. at p. 660.) Thus, we hold

that the FAAAA does not facially preempt the People's UCL action in this case.

To the extent *Fitz-Gerald v. SkyWest, Inc., supra,* 155 Cal.App.4th 411, is

inconsistent with the above analysis and conclusion, we disapprove it.

E. *The People's UCL Action as Applied*

Defendants also challenge the People's action as applied under the

FAAAA. They note that the People assert a single cause of action under the UCL,

premised on violations of the Unemployment Insurance Code, the Labor Code,

and IWC Wage Order No. 9. Defendants contend that under the facts of this case,

the People's action actually seeks to regulate motor carrier competition (i.e.,

prices, routes, or services) directly, by coupling the UCL with various provisions

of Unemployment Insurance Code, Labor Code, and IWC Wage Order No. 9. The

People counter that they filed the UCL claim because defendants sought to evade

the financial and administrative responsibilities of these laws, and compete

unfairly, by misclassifying their truck drivers as independent contractors. The

UCL action, the People argue, is independent of defendants' prices, routes, or

services with respect to the transportation of property. We agree.

In *Morales*, the high court held that state airline advertising guidelines

*related to* airfares, because the guidelines required airlines to disclose material

restrictions on price, and "effectively creat[ed] an enforceable right to that fare

when the advertisement fail[ed] to include the mandated . . . disclaimers."

(*Morales*, *supra*, 504 U.S. at p. 388.) *Morales* calls for an analysis of the

14

underlying state regulations to see if they relate to motor carrier prices, routes, or services when enforced through the UCL.

The sections of the Labor Code and the Unemployment Insurance Code that anchor the People's UCL claim make no reference to motor carriers, or the transportation of property. Rather, they are laws that regulate employer practices in all fields and simply require motor carriers to comply with labor laws that apply to the classification of their employees. In fact, defendants concede "that those state employment laws . . . are laws of general application whose effects on the carriers' prices, routes, and services is remote." Defendants do not concede the point with respect to IWC Wage Order No. 9. Although IWC Wage Order No. 9 regulates wages, hours, and working conditions "in the transportation industry," the sections on which the People rely do not refer to prices, routes, or services. Section 4 governs minimum wage requirements, and section 7 governs employer recordkeeping. If sections 4 and 7 have an effect on defendants' prices, routes, or services, that effect is indirect, and thus falls outside the scope of the test set forth in *Morales*. For this reason, we also reject defendants' argument that the FAAAA facially preempts sections 4 and 7 of IWC Wage Order No. 9.

Defendants next argue that the People's UCL claim, will significantly affect motor carrier prices, routes, and services because its application will prevent their using independent contractors, potentially affecting their prices and services. Defendants claim that if the People's UCL action is successful, they will have to reclassify their drivers as employees, driving up their cost of doing business and thereby affecting market forces.

The defendants' assertion that the People may not prevent them from using independent contractors is correct, but its characterization of the People's UCL claim is not. Nothing in the People's UCL action would prevent defendants from using independent contractors. The People merely contend that if defendants pay

15

individuals to drive their trucks, they must classify these drivers appropriately and comply with generally applicable labor and employment laws.

*Dan's City* observed that the "target at which [Congress] aimed" the FAAAA was " 'a State's direct substitution of its own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide.' " (*Dan's City, supra,* 569 U.S. at p. __ [133 S.Ct. at p. 1780]; see *Columbus v. Ours Garage & Wrecker Service, Inc.* (2002) 536 U.S. 424, 449 (dis. opn. of Scalia, J.) [recognizing FAAAA preemption is limited to laws and regulations that single out for special treatment motor carriers of property; states remain free to enforce general regulations not targeting motor carriers regarding transportation of property].)

*Dan's City* emphasized the FAAAA limiting phrase "with respect to the transportation of property," which strongly supports a finding that California labor and insurance laws and regulations of general applicability are not preempted as applied under the FAAAA, even if they form the basis of the People's UCL action. (See *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.* (1997) 519 U.S. 316, 334 [relying on *Travelers* to conclude that ERISA does not preempt California's prevailing wage law].) The laws invoked here apply to all employers, not just trucking companies. As we noted earlier, *Mendonca* concluded that California's generally applicable prevailing wage laws were not preempted by the FAAAA in part because several states Congress identified as not having laws regulating interstate trucking had prevailing wage laws in place at the time the FAAAA was enacted. (*Ante,* at p. 13.) Similarly, eight out of the 10 jurisdictions identified in *Mendonca* had generally applicable laws governing when a worker is an independent contractor (or the equivalent) and when a worker is an employee. (See Alaska Stat. § 23.20.525; Ariz. Rev. Stat. § 23-902; Del. Code Ann. tit. 19, § 3302; Fla. Stat. § 440.02; Me. Rev. Stat. Ann. tit. 26, § 1043;

16

N.J. Stat. Ann. § 43.21-19; Vt. Stat. Ann. tit. 21, § 1301; Wis. Stat. §§ 102.07, 108.02.) Thus even though the People's UCL action may have some indirect effect on defendants' prices or services, that effect is " 'too tenuous, remote, [and] peripheral . . . to have pre-emptive effect.' " (*Morales*, *supra*, 504 U.S. at p. 390.)

Defendants also contend that the People's UCL claim should be preempted, even if its effect on motor carrier transportation is remote, because it threatens Congress's deregulatory purpose. In *Rowe*, the high court stated that "pre-emption occurs at least where state laws have a 'significant impact' related to Congress's deregulatory and pre-emption-related objectives." (*Rowe*, *supra*, 552 U.S. at p. 371.) Congress passed the FAAAA in order to end a patchwork of state regulations. However, nothing in the congressional record establishes that Congress intended to preempt states' ability to tax motor carriers, to enforce labor and wage standards, or to exempt motor carriers from generally applicable insurance laws. (See *Mendonca*, *supra*, 152 F.3d at pp. 1187-1188 [Congress did not intend ADA to preempt Cal. prevailing wage law]; see also *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [matters traditionally within state's police powers not preempted unless Congress's intent to do so is manifest].)

Defendants argue additionally that the People's UCL claim conflicts with Congress's deregulatory purpose because it erects the very entry control that Congress intended to dismantle. The congressional record does show that Congress disapproved of a California law that denied advantageous regulatory exemptions to motor carriers who used a large proportion of independent contractors. (See H.R. Conf. Rep. No. 103-677, 2d Sess., p. 87, *supra*, reprinted at 1994 U.S. Code Cong. & Admin. News, p. 1759.) As we have noted, however, defendants' claim is factually inaccurate because the People's UCL action does not encourage employers to use employee drivers rather than independent contractors. Defendants are free to use independent contractors as long as they are

17

properly classified.  The People's sole premise for invoking the UCL is to ensure that employers properly classify their employees or independent contractors in order to conform to state law.

CONCLUSION

For the reasons stated, we hold that 49 U.S.C. section 14501(c) does not preempt the People's UCL action.  We therefore affirm the Court of Appeal's judgment.  We leave it to that court to decide how to address the remaining issues on remittitur.  (On remand, the trial court will have to address the merits of the case, i.e., whether the defendants actually misclassified their employees as independent contractors.)

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.
ARONSON, J.*

_____
* Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People ex rel. Harris v. Pac Anchor Transportation, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 195 Cal.App.4th 765
**Rehearing Granted**

_____

**Opinion No.** S194388
**Date Filed:** July 28, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Elizabeth Allen White

_____

**Counsel:**

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette and Mark J. Breckler, Chief Assistant Attorneys General, Martin Goyette, Assistant Attorney General, Jon M. Ichinaga, Amy J. Winn and Satoshi Yanai, Deputy Attorneys General, for Plaintiff and Appellant.

Davis Cowell & Bowe, Richard G. McCracken and Andrew J. Kahn for Los Angeles Alliance for a New Economy and International Brotherhood of Teamsters as Amici Curiae on behalf of Plaintiff and Appellant.

Sands Lerner, Cox Wootton Lerner Griffin Hansen & Poulos, Neil S. Lerner; Trident Law and Arthur A. Severance for Defendants and Respondents.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Law Offices of Stephen Glick, Stephen Glick and Anthony Jenkins for Salvador Rodriguez as Amicus Curiae on behalf of Defendants and Respondents.

Holland & Knight and Linda Auerach Allderdice for California Trucking Association as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Satoshi Yanai
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-0015

Neil S. Lerner
Cox Wootton Lerner Griffin Hansen & Poulos
12400 Wilshire Boulevard, Suite 1300
Los Angeles, CA  90025
(310) 979-9144